LOUIS LESSER, TRANSFEREE, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 63409–63418, 64754–64758. Filed March 7, 1967.

---

[1] Proceedings of the following petitioners are consolidated herewith: Ben Lesser, Transferee, docket No. 63410; William Malat, Transferee, docket No. 63411; Claire Lomas, Transferee, docket No. 63412; Shirley Rudman, Transferee, docket No. 63413; Louis Lesser, Transferee, docket No. 63414; Ben Lesser, Transferee, docket No. 63415; Claire Lomas, Transferee, docket No. 63416; Shirley Rudman, Transferee, docket No. 63417; William Malat, Transferee, docket No. 63418; Louis Lesser, Transferee, docket No. 64754; Ben Lesser, Transferee, docket No. 64755; William Malat, Transferee, docket No. 64756; Louis Lomas, Transferee, docket No. 64757; and Louis Rudman, Transferee, docket No. 64758.

*George T. Altman*, for the petitioners.
*Richard W. Janes*, for the respondent.

HOYT, *Judge:* These proceedings involve transferee liabilities for 1950 income and excess profits taxes of three separate alleged transferor corporations. The deficiencies determined against the transferors and the transferee liabilities determined against each of the petitioners, being the alleged value of assets transferred to them, are as follows:

| Transferor | Deficiency | Transferee | Docket No. | Assets transferred |
|---|---|---|---|---|
| | | Deficiency year ended Aug. 31, 1950 | | |
| Pioneer Plaza, Inc | $132,156.44 | Louis Lesser | 63409 | $65,162.80 |
| | | Ben Lesser | 63410 | 65,087.22 |
| | | William Malat | 63411 | 65,912.83 |
| | | Claire Lomas | 63412 | 66,639.09 |
| | | Shirley Rudman | 63413 | 65,312.08 |
| | | Deficiency year ended Sept. 30, 1951 | | |
| Teri-Plaza, Inc | $81,749.29 | Louis Lesser | 63414 | $42,122.16 |
| | | Ben Lesser | 63415 | 42,232.39 |
| | | Claire Lomas | 63416 | 46,666.10 |
| | | Shirley Rudman | 63417 | 42,039.16 |
| | | William Malat | 63418 | 42,311.48 |
| | | Deficiency year ended July 31, 1951 | | |
| Pioneer Plaza #2, Inc | $36,741.45 | Louis Lesser | 64754 | $12,731.34 |
| | | Ben Lesser | 64755 | 12,571.49 |
| | | William Malat | 64756 | 12,709.60 |
| | | Louis Lomas | 64757 | 12,848.72 |
| | | Louis Rudman | 64758 | 13,234.33 |

The transferor corporations were all engaged in separate residential real estate developments in the Los Angeles area. Respondent has determined that the income realized on the sale of the houses and lots

after the corporations had purportedly sold the houses to the individual stockholders before the construction was finished, was ordinary income to the transferor corporations rather than capital gains to the stockholders.

Petitioners contend that the transferor corporations were not actually engaged in the development of the subdivisions in their own right but were "only agencies [of the stockholders] for a limited purpose," and that the houses were sold to the ultimate purchasers as property of the stockholders individually.

Petitioners further contend that they are not liable as transferees for any unpaid taxes of the transferor corporations, and that in any event the deficiencies are barred by the statute of limitations.

The parties failed to agree to a stipulation of facts as required under our Rules of Practice (Rule 31 (b)) but in their briefs numerous requested findings of fact are agreed to, or not objected to. We regard such requested findings as undisputed or agreed to facts and include them in our Findings of Fact herein by this reference. We have set out below only the facts which we consider essential to the questions determined. Many of the facts requested by the parties are deemed unessential, or argumentative, or are not supported by the evidence, and are, therefore, omitted. The entire extensive record and multitude of exhibits are in many respects contradictory and the record is highly confused and in a very unsatisfactory state.

### FINDINGS OF FACT

Pioneer Plaza, Inc., Pioneer Plaza #2, Inc., and Teri-Plaza, Inc., hereinafter referred to for identification as "transferors," were all corporations organized under the laws of the State of California. Their articles of incorporation conferred broad business powers, including those essential to the subdivision and development of unimproved real estate and the construction and sale of houses thereon.

The transferee petitioners were all residents of California and were stockholders of one or more of the transferor corporations. The income tax returns of all parties involved, for the periods with which we are here concerned, were filed at Los Angeles, Calif. The return of Pioneer Plaza, Inc., was for the fiscal year ending August 31; of Pioneer Plaza #2, Inc., for the fiscal year ending July 31; and of Teri-Plaza, Inc., for the fiscal year ending September 30. The corporate returns were all made on a cash receipts and disbursements and a completed contract basis.

The principal organizers of the corporations were a family group consisting of several members of the Lesser family, sometimes referred to hereinafter as investors, headed by Louis Lesser, and another group of three business associates engaged in the construction business under

the firm name of Aldon Construction Co.,[2] hereinafter sometimes referred to as the contractors. The common stock of all three corporations, of a par value of $5 per share, was divided equally between members of the Lesser group and the Aldon Construction Co. group. Preferred shares of a par value of $100 per share were issued to members of the investors' group only, in payment for the land which they acquired and conveyed to the corporations. The following table shows the date of organization and the stock issued by each of those corporations:

| Stockholder | Pioneer Plaza, Inc. (organized June 29, 1949) | | Pioneer Plaza #2, Inc. (organized Jan. 12, 1950) | | Teri-Plaza, Inc. (organized Dec.13, 1949) | |
|---|---|---|---|---|---|---|
| | Common | Preferred | Common | Preferred | Common | Preferred |
| Ben Lesser | 30 | 320 | 24 | 80 | 15 | 300 |
| Louis Lesser | 30 | 320 | 24 | 80 | 15 | 300 |
| Claire Lomas | 30 | 320 | ------- | ------- | 15 | 300 |
| William Malat | 30 | 320 | 24 | 80 | 15 | 300 |
| Shirley Rudman | 30 | 320 | ------- | ------- | 15 | 300 |
| Albert Leighton | 50 | ------- | 66⅔ | ------- | 25 | ------- |
| Donald Metz | 50 | ------- | 66⅔ | ------- | 25 | ------- |
| Willard Woodrow | 50 | ------- | 66⅔ | ------- | 25 | ------- |
| David Gershuny | ------- | ------- | 40 | 200 | ------- | ------- |
| Eva Gershuny | ------- | ------- | 40 | 200 | ------- | ------- |
| Louis Rudman | ------- | ------- | 24 | 80 | ------- | ------- |
| Louis Lomas | ------- | ------- | 24 | 80 | ------- | ------- |

The elected officers of the transferor corporations were as follows:

### PIONEER PLAZA, INC.

President _____ William Malat
Vice president _____ Donald Metz
Vice president and secretary _____ Willard Woodrow
Secretary-treasurer _____ Albert Leighton

### PIONEER PLAZA #2, INC.

President _____ Louis Lesser
Vice president _____ Donald Metz
Secretary-treasurer _____ Albert Leighton [1]

### TERI-PLAZA, INC.

President _____ William Malat
Vice president _____ Donald Metz
Vice president and
  secretary-treasurer _____ Williard Woodrow
Secretary _____ Albert Leighton

[1] Willard Woodrow elected secretary-treasurer June 30, 1950, following the death of Albert Leighton.

---

[2] Aldon Construction Co. is sometimes referred to as a corporation and sometimes as a partnership. It appears that it may have operated as a corporation until September 1950, when it became a partnership.

Louis Lesser, Claire Lomas, and Shirley Rudman are the son and daughters of Ben Lesser; William Malat, Louis Lomas, and Louis Rudman were sons-in-law of Ben Lesser. David and Eva Gershuny, stockholders in Pioneer Plaza #2, Inc., only, were friends of the Lessers, unrelated to them. Ben Lesser did not actively participate, except as an investor, in the real estate ventures herein involved.

Willard Woodrow, Donald Metz, and Albert Leighton had been associated in the construction business under the name of Aldon Construction Co. for a number of years. The firm had specialized in the development of single-family residential subdivisions. Leighton was the father-in-law of Woodrow and Metz. Leighton and Metz are now both deceased. Aldon Construction Co. had previously joined with members of the Lesser family in other real estate projects.

One of the Lesser enterprises was a partnership known as Lesser & Son which conducted a ladies coat and suit manufacturing business. Louis Lesser was the business and investment leader of the group and William Malat usually acted as the office manager. Other family business activities were conducted in the name of "Louis Lesser Enterprises." The investments in the projects here involved were all on an individual basis.

The three subdivisions under consideration were all in the area of Norwalk, Calif., just southeast of Los Angeles.

In developing a subdivision in Los Angeles County, during the period here involved, a subdivider or contractor usually would first acquire a large tract outside of the metropolitan area zoned as agricultural land and have it rezoned for residential purposes. This rezoning process usually took from 6 to 9 months. During that interval the engineering plans for the sewer, water, and street layouts were prepared. Also during that period the architectural drawings of the houses were made up and submitted to local authorities to obtain building permits. The plans were then submitted to Federal agencies, such as the Veterans' Administration and the Federal Housing Authority, and to local banks in order to obtain underwriting approvals and the various financing aids which those institutions offer. The engineering plans and housing designs were also submitted to various city and county agencies, commissions, and authorities for their inspection with respect to compliance under the State and local regulations and codes. The proposed street layouts, water and sewer systems, drainage designs, etc., were declared on the tract map. After the proposed improvements had received the necessary approvals, the plan was recorded as a platted tract.

Where the development was to be under Veterans' Administration financing, the plans for the houses and their projected costs were submitted to the Veterans' Administration for study and appraisal in order to establish an acceptable value.

When this value was approved, the subdivider was then in a position to receive from the Veterans' Administration its certificate of reasonable value. This certificate sometimes referred to as a commitment, assured the lending institution making the construction loan of the ultimate underwriting by the Veterans' Administration of the takeout loans, which are ultimately made and secured by the purchase-money mortgages or trust deeds. The subdivider then took the Veterans' Administration's commitment to the financing institution. The Veterans' Administration's commitment is necessary to the financing of the interim, or construction, loan. It guarantees that a percentage of the takeout loan will be underwritten by that agency, and also assures that the takeout loan money will be paid over to the original lender who had advanced the construction money.

On a per house and lot basis the takeout loans usually exceeded the construction loan by from 20 to 25 percent. The excess of the takeout loan over the construction loan generally represented the profit to the builder, less escrow costs, etc.

The general procedure outlined was followed by the projects here involved and the construction loans and the takeout loans for each project were obtained from Coast Federal Savings & Loan Association, hereinafter sometimes referred to as Coast Federal, located in Los Angeles, Calif. The transferor corporations gave Coast Federal their promissory notes for the loans. No notes for such loans were executed by any of the stockholders as individuals and no personal obligations on the loans were assumed by any of them.

In making its loans, Coast Federal looked primarily to the amount of the Veterans' Administration's guarantee and whether the houses could be built and sold for that amount, and whether the builder was reliable. Aldon Construction Co. was considered a reliable builder. Coast Federal's practice was to release the loan funds periodically as each stage of the construction was completed. On default of the builder, it was in a position to take over and finish the construction without any serious loss. It made loans only to titleholders of record.

Petitioners, individually, executed written agreements in favor of Coast Federal guaranteeing the "lien free" completion of the houses in all of the subdivisions. They also executed indemnity agreements in favor of the bonding company which handled the surety bonds on any claim against the improvements made on the subdivisions, and in connection therewith submitted individual financial statements. Petitioners also obtained public liability and property damage insurance to cover their liability in connection with the subdivision projects.

Most of the correspondence relating to the procurement of the Veterans' Administration guarantees and the Coast Federal loans was handled by Donald Metz, who sometimes signed as an officer of Aldon Construction Co. and sometimes as an officer of the transferor cor-

porations. A Veterans' Administration "subdivision information form" relating to the Teri-Plaza, Inc., tract dated January 24, 1950, and signed by Metz as vice president of Teri-Plaza, Inc., bears the notation:

Houses will be offered for sale at no down payment to veterans upon completion of first models—large newspaper campaign proposed.

Aldon Construction Co., the main Principal, has developed Veterans Homes, Inc., Excelsior Gardens, Inc., Norwalk Gardens, Inc., Pioneer Plaza, Inc., Lakewood Plaza, Inc.—a total of 1161 houses.

The State of California has a Division of Real Estate which is required to prepare and publish a report on each real estate subdivision within the State. These reports are for the protection of the buying public and are said to reflect the information "furnished by the subdividers and obtained by the Division of Real Estate from examination of the properties." The developer is required to give a copy of the report to each purchaser. Such reports were prepared and published pertaining to the Pioneer Plaza, Inc., subdivision. (There was one report for each of the two separate tracts involved—tract Nos. 15841 and 13882.) The reports contain the statement:

The subdivider has announced the intention of building on each of the lots and selling under various financing plans only after such improvements have been made.

In each of the three subdivisions raw land was purchased by individuals in the investors' group and deeded to the transferor corporations in exchange for preferred stock. In some instances title was transferred temporarily to Aldon Construction Co., for convenience in arranging some of the preliminary matters, and later transferred back to the corporations.

Following the organization of each of the transferor corporations, written agreements were entered into between the investors' group and Aldon Construction Co., the gist of which was that as stockholders and directors of the transferor corporations, they, the investors, would cause the corporations to convey to the individual common stock holders, equally as between the investors and the contractors, all of the houses to be constructed in the subdivisions at a price equal to the cost of the land, plus the cost of construction, plus 5 percent of the actual cost of construction. The agreement pertaining to the Pioneer Plaza, Inc., subdivision was dated July 29, 1949. It provided, in part, as follows:

WHEREAS, there has heretofore been formed a corporation under the style and title of PIONEER PLAZA, INC., which was incorporated under the laws of the State of California; and

WHEREAS, the First Parties have entered into an escrow for the purchase of certain real property in which transaction the First Party acted for the parties herein and the corporation, PIONEER PLAZA, INC., which was incorporated for the parties to acquire said land; and

WHEREAS, all of the parties hereto desire to purchase and acquire all of the capital stock which said corporation will issue and the parties desire to provide for the officers and directors of said corporation their rights, duties, powers and compensation; and

WHEREAS, the parties desire to enter into an agreement concerning the voting rights of said stock and the management and operation of said corporation; and

WHEREAS, the parties desire to enter into an agreement which will preclude the sale, hypothecation or disposition of the stock of the corporation which the parties will acquire; and

WHEREAS, the parties desire to agree among themselves as to the operation of said corporation which said agreement shall be for the benefit of the corporation and of the individual shareholders thereof with the view in mind of obtaining for said corporation the largest possible profits for said corporation which will most likely be obtained as a result of the harmony and concerted action of its shareholders, officers and directors,

Now, THEREFORE, for and in consideration of the mutual promises and agreements herein contained, IT IS AGREED by and between the parties hereto as follows:

1. The parties do hereby acknowledge that PIONEER PLAZA, INC. is a California corporation * * *

\*          \*          \*          \*          \*          \*          \*

3. The parties further agree that as shareholders of said corporation they will amend the Bylaws of said corporation to provide for four (4) directors and that the directors to be elected by them shall hold office for a period of one (1) year or until their successors shall have been unanimously elected by the shareholders and that they will elect the following persons as the Board of Directors of said corporation, to wit:

ALBERT LEIGHTON
DONALD METZ
WILLIAM MALAT
BEN LESSER

The parties do further agree that as shareholders and/or directors of said corporation, they will elect as officers of said corporation the following persons, to wit:

WILLIAM MALAT, president
DONALD METZ, vice president
WILLARD WOODROW, vice president
ALBERT LEIGHTON, secretary and treasurer

4. The parties agree that no salaries shall be paid to any of the officers or directors of said corporation except upon the unanimous vote of all of the parties to this agreement.

5. The parties agree that as directors, officers and shareholders of the corporation, they will cause the corporation to acquire that certain parcel of real property described as:

\*          \*          \*          \*          \*          \*          \*

and that certain parcel of real property described as follows: [The descriptions are of the two parcels comprising the land going to Pioneer Plaza, Inc.'s subdivision.]

\*          \*          \*          \*          \*          \*          \*

7. Each of the parties agrees that he will seek no benefit from said corporation other than or different from the benefits which shall accrue to the other members of said corporation, and that they will each assist each other, both as stockholders, directors, officers and members of said corporation, so that the benefits

of said corporation shall accrue to each of the members of the corporation. This agreement shall be binding upon the heirs, executors and assigns of the respective parties and the parties agree that they will execute such other papers and documents as may be necessary to give effect to the intent of the parties under this agreement.

8. The parties agree that each of them will vote his stock to the end of carrying out the terms of this agreement and declare that the purpose of this agreement is to protect the corporation from dissension among the various stockholders of the corporation and set forth that by concerted and united action, as is mentioned in this agreement, the corporation will derive its greatest profits and benefits, it being the intent of the parties to earn for the corporation the greatest sum possible which the parties agree can only be done with their unanimous consent. For that reason they are entering into this agreement to protect no [sic] only the rights of the individual parties hereto, but the benefits to the corporation as well.

9. The parties further agree that after the corporation acquires the real property hereinbefore described, they will immediately cause the corporation to make application with Veterans Administration for G.I.-insured loans and that should said loans prove satisfactory for the erection of single-family residences on the said lots, that the parties hereto will then so vote as shareholders and directors of said corporation as to cause the corporation to proceed with the construction of single-family homes on said real property.

10. The parties further agree that as officers and shareholders of the corporation, they will cause the corporation to enter into an agreement whereby the corporation will construct a building on each of the lots in the tract of land described hereinbefore in Paragraph 12 at cost plus a fixed fee of five (5%) per cent of the actual cost of construction to be paid to the corporation as a fee for the construction of said buildings. The parties agree that should they agree that it is advisable not to build on certain of said lots by reason of the failure to obtain proper commitments, then and in such event the corporation shall not be obliged to proceed with such construction on said lots.

11. The parties agree that they will so vote their stock so that they will cause the corporation to sell the buildings to be erected by the corporation to the holders of the common shares and that they will so vote as directors of the corporation so that the corporation shall sell to the common shareholders one building for each share of the common stock held by any shareholder.

12. The parties agree that they will so vote as shareholders and directors of the corporation as to cause the corporation to convey title to said real property to the purchasers at the agreed fee plus the actual cost of construction, as well as the cost of the land, and that they will cause the corporation to execute an agreement, a copy of which has been presented to the parties hereto, said agreement to provide an arrangement for the building of said houses on said lots which the purchasers will acquire from the corporation.

The parties agree that they will cause the corporation to enter into such agreement forthwith upon the terms and conditions as appear in the contract presented to the parties.

13. The parties further agree that various of the houses which are to be built by the corporation and which are to be sold to them by the corporation may vary in cost but that notwithstanding such variation, the cost thereof will be apportioned among all of the houses so that the cost of each house and lot will be identical and that they will settle among themselves any differential in price so that the cost to each of the parties hereto will be the same per unit as each other house which they will acquire.

14. Notwithstanding the cost of each of the houses which each of the parties hereto or his nominee may acquire, the parties hereto will settle among themselves the unit cost of each of the houses so that the actual cost per house which each of the parties or his nominee will receive will be uniform. In that respect, it is contemplated that the houses which are to be constructed will be constructed in groups and the parties shall divide the cost of the houses in each group in such manner so that the unit cost of each house in any group will be identical with each other house in said group and the parties will settle among themselves any differential. Likewise, the loan commitments will have a specified period of time and in some instances payments may start on houses of one of the parties whereas payments on houses owned by other of the parties may be deferred. In that respect, the parties agree that all interest charges shall be deemed cost of construction and will be apportioned among all of the houses. Likewise, there shall be included as cost of construction in addition to interest the real property taxes and insurance. The amortized payments, however, which any of the parties may make on the houses which they will acquire shall be the liability and obligation of the individual who receives said houses and makes said payments.

\* \* \* \* \* \* \*

17. The parties further agree that as shareholders and directors of the corporation they will so vote their stock so that no dividends shall be voted to the common shareholders until such time as all of the preferred stock has been retired by the corporation, it being the intent of the parties that the investors, to-wit, Lesser and Son, will first retrieve all of their capital investment in the corporation before any profits are distributed to any of the shareholders, and, in that respect, the parties agree that as soon as funds are available for the retirement of the preferred stock, the preferred stock will be retired before any distribution of profits is made to the common shareholders.

\* \* \* \* \* \* \*

LESSER AND SON, *a co-partnership*
By William Malat
WILLIAM MALAT
*First party*
Albert Leighton
ALBERT LEIGHTON, *Second party*
Donald Metz
DONALD METZ, *Third party*
Willard Woodrow
WILLARD WOODROW, *Fourth party*

The agreement provided that the shareholders would not dispose of the stock for a period of 2 years without the unanimous consent of all the stockholders or until all of the houses were built and sold. Two other similar agreements related to Pioneer Plaza #2, Inc., and Teri-Plaza, Inc., subdivisions dated December 1, 1949, and January 19, 1950, respectively, were executed and signed by the individual members of

the Lesser group, rather than the Lesser & Son partnership. They all differed somewhat in wording but had the same general purpose and basic terms.

In the Pioneer Plaza #2, Inc., agreement, David I. and Eva Gershuny were designated first parties, Louis and Ben Lesser, Louis Lomas, Louis Rudman, and William Malat, second parties, and Aldon Construction Co., third party. The agreement relating to the Teri-Plaza, Inc., tract, designated Louis Lesser, William Malat, Ben Lesser, Shirley Rudman, and Claire Lomas, first parties, and Aldon Construction Co., second party.

On October 31, 1949, a further agreement was entered into by Pioneer Plaza, Inc., as first party, and Aldon Construction Co., second party, which provided, in part, as follows:

WHEREAS the corporation has heretofore acquired certain real property in Tracts 15841 and 13882 in the County of Los Angeles, State of California, and desires to proceed with the erection on said land of 304 single family residences; and

WHEREAS the corporation desires to enter into an agreement with the contractor by which the contractor will build said houses for the corporation on said land; and

WHEREAS the contractor desires to enter into a contract with the corporation which shall provide for the fee to be paid to the contractor for the services to be rendered by it in connection with said building project; and

WHEREAS it appears that the corporation had heretofore entered into an agreement with Albert Leighton, Donald Metz and Willard Woodrow by which said persons were to build said houses for the corporation and, in consideration therefor, were to receive fifty per cent of the houses to be erected by them at cost plus a fixed fee of five per cent of construction costs; and

WHEREAS there was heretofore deeded to said persons certain real property upon the agreement of said persons to proceed with the construction of the houses on said tracts; and

WHEREAS said persons are willing to deed said lots to the contractor, in consideration for which the contractor will proceed with the building in place and stead of Albert Leighton, Donald Metz and Willard Woodrow; and

WHEREAS all agreements between said Albert Leighton, Donald Metz and Willard Woodrow have been mutually rescinded;

Now, THEREFORE, for and in consideration of the mutual promises and agreements herein contained, it is agreed by and between the parties hereto as follows:

1. The contractor agrees to build for the corporation and the corporation agrees to have the contractor build for it on the lots in Tract 15841 and Tract 13822, [sic] which comprise 304 lots, 304 single family residences.

2. The corporation represents that it has heretofore made and obtained from the Coast Federal Savings & Loan Association an application for interim financing and applications with the Federal Housing Administration and Veterans' Administration for Veterans' Administration insured loans, and that said loans have been made and have been recorded, and that the corporation is now ready and able to proceed with the development of said land and the construction of houses thereon, and that the corporation has sufficient funds with which to proceed in said venture.

3. The corporation represents that it has heretofore deeded all of the lots subject to first deeds of trust to various and sundry shareholders, as well as

having deeded one-half thereof to Albert Leighton, Donald Metz and Willard Woodrow. It is agreed that said Albert Leighton, Donald Metz and Willard Woodrow may deed said lots to the contractor, the same to apply toward the fee due to the contractor as is hereinafter more fully set forth.

4. The contractor agrees that it will cause to be constructed on said lots in said tracts, comprising 304 lots in all, 304 single family residences, all of which shall be constructed in accordance with the plans and specifications used by the corporation in obtaining the loans and in accordance with the plot plan referred to herein as Exhibit "A" and adopted by reference, and that the contractor will diligently proceed with construction work to its ultimate and final conclusion.

5. Contractor agrees that it will furnish or cause to be furnished, and provide or cause to be provided, all of the necessary labor, materials, tools, implements and appliances and that it will do and perform all of the work in connection with said construction project in a good and workmanlike manner and will build the houses on each of the lots aforesaid for the owner at cost, and that it will not charge any executive salaries for any of the members or officers of the Aldon Construction Co. Included in costs shall be all of the necessary and normal costs usually incurred in a building project and usually considered as proper items of cost under present accounting methods, it being agreed between the parties that there is at present a standard method of application of costs in small home development projects. Costs shall include, among other things, all labor and material, inspection fees, permits, interest on construction loans, office overhead, superintendent and supervision, accounting fees, attorneys' fees incurred in connection with the corporate structure for the development and building of the houses, and each and every other item of cost, exclusive, however, of the personal drawings or salaries of officers of either the corporation or of the contractor, it being the intent of the parties that costs shall include primarily the direct labor cost for developing the project.

6. It is agreed that all bills for labor and material shall be submitted by the contractor to the corporation, and the corporation shall pay all such bills and costs directly, the contractor acting primarily as the agent for the corporation and there being no obligation on the part of the contractor to advance and expend any moneys for the corporation. It is the agreement of the parties that all costs shall be borne by the corporation directly and not by the contractor, but that all bills shall first be approved by the contractor before they are submitted to the corporation for payment.

7. The corporation agrees to keep accurate books of account and to enter in said books all items of cost, and such books shall at all times be open to the contractor for its inspection.

8. The parties agree that, as consideration for the services to be rendered by the contractor in performing its duties in the construction of said buildings and the development of said project, shall be the right on the part of the contractors to acquire from the corporation fifty per cent of all of the buildings built, at the cost of construction, plus five per cent thereof, together with the cost of the land and subject only to first deeds of trust on each of the lots which shall be deeded to the contractor. There has heretofore been deeded to Albert Leighton, Donald Metz and Willard Woodrow fifty per cent of all of the lots upon which houses are to be constructed, and it is agreed that the contractor shall accept the deed from Albert Leighton, Donald Metz and Willard Woodrow, subject to first deeds of trust, as consideration for the services to be rendered it in the building and development of said land and the construction of the houses thereon, it being agreed by Albert Leighton, Donald Metz and Willard Woodrow that the Aldon Construction Co. may undertake to build said houses and it being agreed by said persons that they will deed said land to the contractor. The said persons have

heretofore executed their note to the corporation for the houses to be deeded to said persons. It is agreed that the corporation shall return said note to said persons and shall, in lieu thereof, accept the note of the contractor as payment of the equity in each of said houses, and that in all respects the contractor shall be substituted in the place and stead of Albert Leighton, Donald Metz and Willard Woodrow.

9. The plans and specifications used for the purpose of obtaining loans from the lending institutions are intended to supplement each other, so that any work set forth in either, but not mentioned in the other, is to be executed as if mentioned and set forth in both. Likewise, all of the services to be rendered and performed by the contractor shall be in accordance with City, County, State and Federal laws, ordinances and regulations, and shall meet all of the requirements of the State Building Code or of the codes of the city where such houses are to be erected, and shall likewise meet the approval and requirements of the Federal Housing Administration and/or the Veterans' Administration and/or the lending institution.

10. The contractor shall proceed with the work immediately and shall proceed with the work in an orderly and efficient manner for and on behalf of the corporation, and agrees to complete the same within twelve (12) months from the date hereof. * * *

\* \* \* \* \* \* \*

13. So long as the corporation shall pay all bills for labor and material, the contractor agrees to complete all of its work without liens for labor or materials, and to deliver said buildings to the corporation and/or its nominees or grantees free and clear of any lien for any labor or material furnished or for anything done in connection with said project, provided, however, that the proceeds of the loans are deposited from time to time with the corporation and are at all times available to the contractor in connection with said construction project, and provided further that the actual cost of labor and materials does not exceed the amount of the loans.

14. Should any dispute arise concerning the terms of this agreement, then and in such event Albert H. Allen is hereby appointed to act as arbitrator for the purpose of settling any disputes between the parties and the decision of such arbitrator so selected shall be binding upon the parties. The parties may agree upon one or more additional arbitrators, but unless additional arbitrators are agreed upon the arbitrator herein appointed shall act and his decision shall be binding upon the parties.

15. The parties agree to cooperate with each other toward the end that said project may proceed as expeditiously and rapidly as possible, and the parties agree to execute such other and further documents as may be necessary to give effect to this agreement.

Agreements similar to that above of October 31, 1949, were entered into with respect to the Pioneer Plaza #2, Inc., and Teri-Plaza, Inc., developments on December 1, 1949, and January 19, 1950, respectively.

Construction was begun on the Pioneer Plaza, Inc., tracts first, but later on houses were being built on all three tracts at the same time.

Subcontracts for materials and services were entered into with various subcontractors by the three transferor corporations. The sub-

contracts were signed by the corporate officers and bore the corporate seals.

At all times here material, there was a severe housing shortage in the Los Angeles area and there was a "sellers' market" for houses built in the subdivisions involved. Most of these houses were sold, or applications for their purchase, with deposits, were received from prospective purchasers, before they were actually completed. All of the houses in the Pioneer Plaza, Inc., subdivision were sold on the first day offered to the public.

Titles to the houses and lots in each of the subdivisions were conveyed to the individual stockholders of the transferor corporations, pursuant to the agreements referred to above, after some of the houses had been sold. In consideration therefor petitioners each gave the transferor corporations their promissory notes payable on demand with interest. The notes given to Pioneer Plaza, Inc., by petitioners dated October 31, 1949, were for $33,000 each; those to Pioneer Plaza #2, Inc., dated April 18, 1950, for $8,400 each; and those to Teri-Plaza, Inc., dated April 21, 1950, for $26,400 each. The dates of the conveyances of the lots to petitioners, the number of houses then completed, the total number of houses eventually built, and the dates on which the last sales of houses were recorded, were as follows:

| Name of corporation | Date of conveyance of lots | Houses then built | Total number of houses sold | Last sale recorded |
|---|---|---|---|---|
| Pioneer Plaza, Inc | Oct. 20, 1949 | 50 (about) | 304 | May 4, 1950 |
| Pioneer Plaza #2, Inc | Apr. 24, 1950 | 41 | 120 | Apr. 4, 1951 |
| Teri-Plaza, Inc | Apr. 21, 1950 | 37 | 207 | Aug. 15, 1951 |

After the houses in each subdivision were all sold to the public, the corporations were dissolved and liquidated.

The sales of the houses to the ultimate purchasers were all made through the escrow agent, Security Land Escrow Co., in the names of the transferor corporations and the proceeds from the sales were deposited in special accounts set up for that purpose. The special accounts were all handled by Albert H. Allen, who served as attorney for Aldon Construction Co. and the transferors, and also as broker for all of the sales. As these amounts were received, the trustee for the special accounts issued checks to the individual stockholders and they, in turn, issued checks for the identical amounts back to the corporations. These payments to the corporations were stopped when the obligations to the corporations and to Aldon Construction Co. were fully paid. The moneys thereafter received by the stockholders out of the special accounts were retained by them.

Each of the corporations made distributions as payments to its stockholders in 1950 and 1951, as follows:

| | Cash from special account 1950 | | Preferred stock | | Common stock | | Total |
|---|---|---|---|---|---|---|---|
| | | | Redeemed | Dividend | Redeemed | Dividend | |
| | | | *Pioneer Plaza, Inc.* | | | | |
| Ben Lesser | $32,137.22 | | $32,000 | $800.00 | $150 | | $65,087.22 |
| Louis Lesser | 32,212.80 | | 32,000 | 800.00 | 150 | | 65,162.80 |
| Claire Lomas | 33,689.09 | | 32,000 | 800.00 | 150 | | 65,639.09 |
| William Malat | 32,962.83 | | 32,000 | 800.00 | 150 | | 65,912.83 |
| Shirley Rudman | 32,362.08 | | 32,000 | 800.00 | 150 | | 65,312.08 |
| | | | *Pioneer Plaza #2, Inc.* | | | | |
| | 1950 | 1951 | | | | | |
| Ben Lesser | $4,297.57 | | $8,000 | $153.92 | | $120.00 | $12,571.49 |
| Louis Lesser | 3,021.56 | $1,435.86 | 8,000 | 153.92 | | 120.00 | 12,731.34 |
| Louis Lomas | 4,574.80 | | 8,000 | 153.92 | | 120.00 | 12,848.72 |
| William Malat | 3,901.24 | 534.44 | 8,000 | 153.92 | | 120.00 | 12,709.60 |
| Louis Rudman | 4,410.65 | 549.76 | 8,000 | 153.92 | | 120.00 | 13,234.33 |
| | | | *Teri-Plaza, Inc.* | | | | |
| | 1950 | 1951 | | | | | |
| Ben Lesser | $6,277.43 | $9,060.11 | $26,000 | $827.35 | | $67.50 | $42,232.39 |
| Louis Lesser | 5,150.05 | 10,077.26 | 26,000 | 827.35 | | 67.50 | 42,122.16 |
| William Malat | 8,789.55 | 6,627.08 | 26,000 | 827.35 | | 67.50 | 42,311.48 |
| Claire Lomas | 12,749.65 | 7,021.60 | 26,000 | 827.35 | | 67.50 | 46,666.10 |
| Shirley Rudman | 9,103.33 | 6,040.98 | 26,000 | 827.35 | | 67.50 | 42,039.16 |

In each of the subdivisions the construction expenses exceeded the construction loans and capital paid in to the corporation by the following amounts:

Pioneer Plaza, Inc. _____ $208,861.09
Pioneer Plaza #2, Inc. _____ 160,192.02
Teri-Plaza, Inc. _____ 201,147.04

This excess was paid out of the proceeds from the sales of the first built houses.

Construction fees were paid by the corporations to Aldon Construction Co. in approximately the same amounts as the dividends on the preferred shares.

At all times here material Aldon Construction Co. maintained offices at 13421 San Antonio Drive, Norwalk, Calif. The books and records pertaining to all three subdivisions were kept at that office. The income tax returns of the transferor corporations and of the individual stockholders were prepared by the accountants employed by Aldon Construction Co. and the transferors.

The income tax returns filed by the transferor corporations for their respective fiscal years show the following:

| | Pioneer Plaza, Inc., year ended Aug. 31, 1950 | Pioneer Plaza #2, Inc., year ended July 31, 1951 | Teri-Plaza, Inc., year ended Sept. 30, 1951 |
|---|---|---|---|
| Gross Receipts from operations | $2,119,785.01 | $1,000,988.64 | $1,713,174.79 |
| Cost of operations | 2,125,961.09 | 1,004,092.02 | 1,720,191.69 |
| Operating gain or loss | (6,176.08) | (3,103.38) | (7,016.90) |
| Interest on loans, notes, etc | 9,977.00 | 3,439.75 | 9,246.89 |
| Other income | 887.33 | 1,746.02 | 4,269.32 |
| Total income | 4,688.25 | 2,082.39 | 6,499.31 |
| Net income | 4,688.25 | 2,082.39 | 6,499.31 |

The figures, as shown above, were adjusted by respondent in the notices of transferee liabilities to petitioners, as follows:

| | Pioneer Plaza, Inc. | Pioneer Plaza #2, Inc. | Teri-Plaza, Inc. |
|---|---|---|---|
| Total sales, as corrected | $2,486,450.00 | $1,110,750.00 | $1,948,500.00 |
| Cost of goods sold, as corrected | 2,161,445.79 | 1,037,215.06 | 1,796,124.51 |
| Revised gross income | 325,004.21 | 73,534.94 | 152,375.49 |
| Increase in gross income | 331,180.29 | 76,638.32 | 159,392.39 |

(The above figures include minor adjustments in sales of appliances by Pioneer Plaza, Inc., and Teri-Plaza, Inc.)

The net income reported by each of the corporations includes interest on the promissory notes executed by the stockholders in payment for the lots transferred to them by the corporations in the following amounts: Pioneer Plaza, Inc., $9,977.00; Pioneer Plaza #2, Inc., $3,439.75; and Teri-Plaza, Inc., $9,246.89. Respondent determined that this sale of the lots to the stockholders was fictitious and eliminated the interest from the corporations' income.

In their individual income tax returns, petitioners reported the income received from the sale of the lots deeded to them by the transferor corporations as long-term capital gains. Respondent determined that the amounts so reported were ordinary income. The notice of deficiency sent to William and Ethel Malat is, in part, as follows:

(1) The net profit of $30,045.48 returned by you as a long-term capital gain from the sale of 31 lots, Pioneer Plaza, has been increased to a net profit of $32,962.83 from the sale of 31 homes. The homes are part of a single subdivision tract financed and constructed by Pioneer Plaza, Inc. The corrected net profit was received and retained by you under a claim of right and without restrictions as to its disposition.

*It is held the sales were those of Pioneer Plaza, Inc., and the net profits are taxable first to it and then, as corporate distribution to you as a stockholder of Pioneer Plaza, Inc., as ordinary income under section 22(a) of the 1939 Internal Revenue Code.*

In the alternative it is held that the homes were not capital assets but were held primarily for sale to customers in the ordinary course of your trade or business. The net profit from the sale is taxable as ordinary income under the provisions of section 22(a) of the Internal Revenue Code of 1939.

The capital gain of $15,022.74 (50 percent of $30,045.48) has been eliminated from your income.

[Similar notices were sent to the other stockholders. Emphasis added.]

In response to these notices of deficiencies, petitions were filed with this Court and at the trial in the consolidated proceedings the petitioners moved for judgments for the deficiencies determined by respondent, based on respondent's alternative determination, as quoted above. We sustained the deficiencies determined by respondent, subject to recomputation under Rule 50, not in accordance with petitioners' motion but for failure of proof of error in respondent's determination. See *William Malat*, 34 TC. 365 (1960), affd. 302 F. 2d 700 (C.A. 9, 1962), certiorari denied 83 U.S. 308. We stated at page 368:

> The only apparent purpose of the motions would be to have this Court decide in the case of the stockholder, and without any evidence, that his corporation had no income from the sale of residences. Obviously this would not be proper. The cases of the corporations may be pending before this Court. Their liability for tax cannot be adjudicated by such a pleading maneuver as petitioners make.
>
> Since petitioners, who have the burden of proof, submitted their cases on such motions without any evidence, the motions are utterly meaningless. Since they move for judgment against themselves in the exact amount determined, and introduce no evidence, and state they do not care to introduce evidence but will rest on their motions, they have no standing to ask this Court to base its judgments on conceded facts, or any pleading admissions. Respondent's determination of a deficiency is presumptively correct. When there is failure on the part of a taxpayer to introduce any evidence that it is not, the only judgment that will be entered against him for the determined deficiency will be based upon that presumption of correctness that attaches to respondent's determination and the taxpayer's failure to carry his burden of proof to show it was not.

On appeal the Court of Appeals in affirming stated as follows:

> We are advised that there are pending before the Tax Court other cases in which the Commissioner has asserted deficiencies against the corporations involved and in which these same petitioners are also the petitioners because they are transferees of the corporations' assets. It thus appears that what the taxpayers here have tried to do is to execute a maneuver whereby they hoped, without presenting any evidence on the subject to obtain a binding adjudication that the sales were by them and not by the respective corporations, thereby killing off the other pending cases. The Tax Court refused to lend itself to this little game, and we think that what it did was proper.

These cases are the transferee cases referred to therein.

In determining the deficiencies against the transferor corporations on which the transferee liabilities here involved are based, repondent included in the corporation's gross sales all of the sales of houses to the ultimate purchasers, as shown in the records of the escrow agent through whom the sales were made. Only the sales of houses to the stockholders, and not those to the public, were shown in the corporation's books and income tax returns. The figures appearing in the books and in the returns are in substantial accord, and their correctness has not been questioned here.

The transferors' taxable years, the dates when their returns were filed, and the dates of the mailing of the transferee notices in these proceedings, are as follows:

| Returns | Pioneer Plaza, Inc. | Pioneer Plaza #2, Inc. | Teri-Plaza, Inc. |
|---|---|---|---|
| Taxable year | Aug. 31, 1950 | July 31, 1951 | Sept. 30, 1951 |
| Return filed | May 15, 1951 | Mar. 12, 1952 | Dec. 21, 1951 |
| Transferee notices | Apr. 25, 1956 | Sept. 13, 1956 | Apr. 26, 1956 |

As previously indicated the petitioners have affirmatively pleaded the statute of limitations as a bar to the asserted deficiences. In turn, respondent alleges in his answers that the transferor corporations omitted from gross income an amount properly includable therein in excess of 25 percent of the gross income reported and that therefore the deficiency notices were timely under sections 275(c) and 311(b) of the Internal Revenue Code of 1939. At trial respondent filed a motion to amend his answers in docket Nos. 63409 through 63413 to allege an extension by waiver of the statute of limitations with respect to assessment of taxes due from Pioneer Plaza, Inc. This extension was executed on November 4, 1953, after dissolution of Pioneer Plaza, Inc., by Donald Metz, the former vice president of that corporation. Rule 32 of our Rules of Practice specifically provides that the burden of proof of any new matter pleaded by respondent in his answer is upon him.

OPINION

The principal question presented here is whether the profits from the three real estate developments involved were realized by the transferor corporations or by the transferee stockholders.

Respondent has determined that the profits from the sale of the houses to the ultimate purchasers were the income of the corporations, and has characterized the purported sale of the houses and lots to the stockholders at cost plus 5 percent as a sham transaction and a tax avoidance scheme to divert the corporate income to the shareholders as capital gains.

Petitioners argue that the transferor corporations were not the actual owners of the real estate developments bearing their names or of the profits from the ultimate sale of the houses and lots but were mere agencies of the stockholders organized and utilized for limited purposes preliminary to the construction and sale of the houses.

Respondent's determination, we think, must be approved. The carefully planned machinations by which legal title to the properties was shifted back and forth between the stockholders and the corporations, the meaningless exchange of checks between them, the disclosure in the books and income tax returns of the corporations' operating losses, in spite of the large profits realized from each of the real estate developments, the stockholders' pointed declarations of an intention to have the corporations realize profits, whereas they all reported operating losses, and the inclusion of all of the profits from the subdivisions in

the stockholders' returns as capital gains, all support respondent's theory of a meaningless series of sham transactions and a tax-avoidance scheme.

The only discernible reason for having the corporations go through the motion of transferring the houses to the stockholders before some of them were even built, was to shift or lessen the tax on the gains from the sales. While it is the undeniable right of taxpayers to so arrange their business affairs as to minimize taxes, *Gregory* v. *Helvering*, 293 U.S. 465 (1935), the arrangement cannot be a mere sham; it must be one of substance and not mere form. *Higgins* v. *Smith*, 308 U.S. 473 (1940).

At the time the transfers were made, the construction of the houses in each of the subdivisions was in full progress and was not in anyway affected thereby. There was no increase in the stockholders' participation or restriction of the activities of the corporations.

The corporations acquired the land for development in exchange for their preferred stock. They each entered into agreements with Aldon Construction Co. to build the houses for one-half the profits from the ventures. They secured approval and certificates of reasonable value from the Veterans' Administration, furnished the information required by the California Real Estate Commission, obtained the construction loans, purchased building supplies, entered into contracts with subcontractors, paid for advertising the properties, furnished the necessary operating assets, and, finally, sold the houses to the ultimate purchasers. The individual petitioner shareholders actually contributed little to the production of the income, except to furnish some of the necessary cash, lend their personal indorsement to some of the corporate obligations, and serve as officers and directors of the corporations. They acted very much like other investors in small closely held corporate enterprises.

No serious question has been raised by any of the parties as to the status of the corporations here involved as recognizable tax entities.[3] They complied with all statutory requirements for corporate organization, held themselves out to the public as corporations, performed the usual corporate functions for which they were chartered, and filed corporation income tax returns. The corporations were owners of the subdivision houses appearing as such on the closing of each escrow account; the sales proceeds were received by the corporations and deposited into the corporate accounts. In effect the distribution to the petitioner shareholders took place thereafter after payment to and receipt by the transferor corporations. True this was by prior ar-

---

[3] At most petitioners make only a half-hearted suggestion to this effect.

The following quotation is from petitioners' brief (p. 3) :

"Again, we do not contend that the corporations were mere conduits. However, we do contend that, considering the underlying agreements, each was, both in form and substance, not a corporation but an inseverable segment of a joint venture. * * *

"* * * they were only agencies for a limited purpose * * *"

rangement, but it cannot be gainsaid that prior transfer of bare legal title to petitioners was a sham, mere window dressing and without any substance or reality for tax purposes. All of the corporations here were taxworthy entities which generated the income realized from the subdivision projects.

Petitioners undertake to explain the operating losses reported by the corporations in their returns as the result of failure to include general and administrative expenses in the costs to which the cost-plus-5-percent formula was to be applied in determining the sale price of the houses and lots to the stockholders, and the absorption of such excess by the corporation. However, the construction agreement provided for the inclusion of "overhead" in the costs to which the 5-percent formula was to apply. The claimed losses themselves were lacking in reality.

The situation here is much like that in *Aldon Homes, Inc.*, 33 T.C. 582 (1959). The principals there were a group of three individual members of Aldon Construction Co., a partnership, called the management group, and a number of other individuals and firms, called the investors group. Together they formed a corporation, called Aldon Homes, Inc. Some of that corporation's stock was acquired by each group, with the management group retaining control.

Aldon Homes, Inc., acquired several parcels of real estate for subdivision and development. The investment group contributed $300,000 of funds for that purpose and was to receive 50 percent of the profits from the venture. The management group was to receive the other half. After construction of the houses was begun, 16 additional corporations, called the Alphabet Corps. were formed, and Aldon Homes, Inc., conveyed to each of them, at cost, 14 or 15 of the lots under development in exchange for their promissory notes. The management group retained a controlling interest in the corporations.

Another corporation controlled by the management group, Dorma Homes, Inc., was engaged, under contracts with the Alphabet Corps., to construct the houses. The Alphabet Corps. issued bonds and notes in the amount of $300,000 to the investors group. Thereafter there was a series of exchanges of checks between the different groups and redemption of bonds and notes which, in the end, resulted in an equal distribution of the profits from the entire venture to the management and investors groups. We held that the Alphabet Corps. were not recognizable tax entities, not having any substantial business purpose, and that the income from the venture was earned by and taxable to Aldon Homes, Inc. Here the transferor corporations occupied much the same position as Aldon Homes, Inc., and petitioners, individually, were in the position of the Alphabet Corps.

Petitioners cite *Walter H. Kaltreider*, 28 T.C. 121 (1957), affd. 255 F. 2d 833 (C.A. 3, 1958), in support of their contention here, that the

income in dispute was earned by them individually and that the corporations acted merely as their agents  There a family group organized a corporation to construct houses on land which they had previously purchased.  The individuals did the preliminary development work and retained title to the land until the houses were built and sold to the public.  They reported the income from the sales in their individual income tax returns as capital gains.  In the Tax Court proceeding they contended that the business of building and selling the houses was carried on by the corporation and that the houses were not assets held by them individually for sale to the public.  We held, sustaining respondent's determination, that the taxpayers themselves were engaged in the real estate business individually, with the corporation acting as their agent, and that the gains from the sale of the houses were ordinary income to them.  The Court of Appeals affirmed.

The distinction between the *Kaltreider* and the instant case lies in the difference in the relationship of the stockholders to their corporations, the purposes and functions of the corporations, and the posture of the questions presented to the Court.  In the *Kaltreider* case the only question presented was whether the income from the sale of the houses, admittedly the income of the stockholders, was ordinary income or capital gain.  The corporation there never held title to the real estate and no question of its taxability on the sales of the houses was raised.  There was no attempted sale of the houses or lots by the corporation to the stockholders before they were sold to the public and no juggling of accounts or exchange of checks between the corporation and the stockholders.  The case is no authority for the position taken by the petitioners here that they and not the transferor corporations earned the income from the sale of the houses.

Petitioners' argument that the corporations here were intended to serve as agents for the stockholders in the preliminary stages of the developments, and acted only in that capacity, is contrary to the evidence.  The facts are that the corporations, and Aldon Construction Co., under its contracts with them, performed all of the work done in all three of the subdivisions, even making the final sales of the houses to the public.  Whatever may have been the purpose of the plan to transfer title of the houses to the stockholders, whether to shift the tax on the gains from their sale from the corporations to the stockholders themselves or to enable the stockholders to report the gains from the sale of the houses as capital gains rather than ordinary income, the results, insofar as we are presently concerned, are the same.  The plan had no bona fide business purpose but was in essence a sham tax-saving device which cannot relieve the transferor corporations of tax liability on the ultimate sales of the houses to the public.

Petitioners argue further that respondent is now estopped to claim that the income from the sale of the houses is taxable to the corpora-

tions, having previously determined, and the determination having been sustained by this Court (*William Malat*, 34 T.C. 365 (1960)), that it was taxable to the individual stockholders as income "from sales made by them." The fact is, however, that this Court never made any such determination. All that has been previously determined is that the income was taxable to the petitioners as ordinary income rather than as capital gains. Petitioners undertook by motions filed in *Malat* to have this Court determine that the income derived from these projects was from the sale of assets held by them individually primarily for sale to customers in the ordinary course of their business. We declined to make such a determination and upheld the deficiencies because petitioners there introduced no evidence to overcome the presumptive correctness of the Commissioner's determination. As our Findings of Fact here reflect, the Court of Appeals affirmed our decision not to lend ourselves to that "little game," 302 F. 2d 700, 706.

On the evidence before us we find no error in respondent's determination that the gain on the sale of the houses in all three of the subdivisions was the income of the transferor corporations. Certainly petitioners have failed to introduce evidence sufficient to overcome the presumption of correctness attached and afforded to the deficiency determinations before us.

### *Transferee Liability*

Petitioners make the further contention that in any event they are not liable as transferees for any taxes due from the transferor corporations. Section 311(a), I.R.C. 1939, authorizes the assessment and collection from transferees of any liability at law or in equity for taxes due from their transferors.

Generally, transferee liability results when stockholders receive corporate distributions for which they do not pay an adequate and full consideration at a time when the corporation is insolvent, or thereby becomes insolvent, or is in process of liquidation. See *Bartmer Automatic Self Service Laundry, Inc.*, 35 T.C. 317 (1960); *Sidney Kreps*, 42 T.C. 660 (1964).

The liabilities asserted against petitioners are for the actual cash distributions which they received from the transferor corporations. Those distributions represented, for the most part, redemption of preferred stock which had been issued to them in payment for the land which they conveyed to the corporations, dividends on preferred and common stock, in relatively small amounts, and cash distributions from the special accounts into which the proceeds from the ultimate sale of the houses were deposited. Substantially all of these distributions were made out of the proceeds from the sale of the houses to

the public and after the transferor corporations had received the income on which the deficiencies here are based.

The parties are in agreement that the question of transferee liability is to be determined under the laws of the State of California. See *Commissioner* v. *Stern*, 357 U.S. 39 (1958).

In establishing the transferees' liabilities at law, respondent cites, among others, the following provisions of the California Civil Code:

[Sec. 3439.04] * * * Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration. * * *

[Sec. 3439.05] * * * Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent. * * *

[Sec. 3439.07] * * * Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors. * * *

The United States was, of course, a "future," if not a "present," creditor of the transferor corporations in respect of the Federal income taxes found to be owing by them.

It is obvious, we think, that the situation here comes within the intendment as well as the plain wording of the California statutes. Respondent cites a number of cases in the California courts which support that view. Our determination that the transfer of the houses to the shareholders was a part of a scheme to avoid taxes, necessarily carries with it the finding that the transfers were all for the purpose of hindering or delaying, if not defrauding, the United States, and we so hold.

As to transferees' liability in equity, the laws of the State of California followed the general rule that the assets of an insolvent corporation distributed to the stockholders remained subject to claims of the corporation's creditors. *Trubowitch* v. *Riverbank Canning Co.*, 30 Cal. 2d 335, 182 P. 2d 182 (1947).

The following quotation is from the cited case (pp. 188–189) :

Since the assets of a dissolved corporation can only be distributed to the shareholders subject to the rights of creditors of the corporation, the assets of the corporation remained subject to an equitable charge for all debts owed by the corporation (see Civ. Code, sec. 402; Estate of Scrimger, 188 Cal. 158, 166, 206 P. 65; *Stanford Hotel Co.* v. *M. Schwind Co.*, 180 Cal. 348, 354, 181 P. 780; 16 Fletcher, Cyc. Corporations, Perm.Ed., secs. 8127, 8161; Ballantine, Corporations, Rev.Ed., 723; see 97 A.L.R. 480), * * *

The liabilities determined against the petitioners here are for the cash distributions made to them by the transferor corporations. The

distributions left the corporations without means of paying the income taxes later determined against them. Thus, petitioners are liable in equity as well as in law for the transferors' taxes to the extent of the value of assets received by them. The record amply supports the conclusion that the petitioners are all liable as transferees to the extent determined in all cases before us.

### Statute of Limitations

Petitioners further contend that even if all the profits from the projects are income of the corporations, the statute of limitations now bars the assessment and collection of the taxes proposed in the notices of transferee liabilities. We agree, albeit reluctantly.

The period for assessment of transferee liabilities expires 1 year after the expiration of the period of limitations for assessment against the transferor. Sec. 311(b) (1), I.R.C. 1939. The period for assessment against the transferor corporations here normally would have expired 3 years from the dates of the filing of their returns. Sec. 275(a), I.R.C. 1939. However, under section 275(c) the statute is extended to 5 years "if the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return." Respondent alleges and has the burden of proving here that the transferor corporations omitted gross income in excess of 25 percent of that reported and that the 5-year period of section 275(c) applies. *C. A. Reis*, 1 T.C. 9 (1942).

The pertinent dates here are shown in the following table:

|  | Pioneer Plaza, Inc. | Pioneer Plaza #2, Inc. | Teri-Plaza, Inc. |
|---|---|---|---|
| Deficiency year | Aug. 31, 1950 | July 31, 1951 | Sept. 30, 1951 |
| Date returns filed | May 15, 1951 | Mar. 12, 1952 | Dec. 21, 1951 |
| Three-year statute of limitations | May 15, 1954 | Mar. 12, 1955 | Dec. 21, 1954 |
| Date of transferee notices | Apr. 25, 1956 | Sept. 13, 1956 | Apr. 26, 1956 |
| Limitation date under sec. 275(c), I.R.C. 1939 | May 15, 1956 | Mar. 12, 1957 | Dec. 21, 1956 |

The deficiency notices were mailed more than 3 years but less than 5 years from the dates on which the returns were filed. Thus, our question is whether there was an omission in the transferors' returns of gross income in excess of 25 percent of the amount of gross income therein stated.

*The Colony, Inc.* v. *Commissioner*, 357 U.S. 28, 32 (1958), holds that section 275(c) is limited to situations "in which specific receipts or accruals of income items are *left out* of the computation of gross income" and where the Commissioner is at a special disadvantage in detecting errors because the return on its face provides no clue to the existence of the omitted income.

In its return for the year ended August 31, 1950, Pioneer Plaza, Inc., reported under the gross income caption "gross receipts $2,119,-

785.01" less "cost of operations $2,125,961.09" and an operating loss of $6,176.08. The return contained no detailed explanation of the source of the receipts although the costs of operation were all identified. In determining the tax liability of Pioneer Plaza, Inc., respondent increased the gross receipts from $2,119,785.01 to $2,486,450 and also made upward adjustments in the operating costs. The increase in gross receipts was approximately the same amount as the profits from the sale of houses to the public as reported by the transferees in their returns. Respondent's explanation of the adjustment was:

It has been held that the profits from the sale of real estate and houses received by Albert Allen, Trustee, and the funds diverted to all of the stockholders of Pioneer Plaza, Inc., are taxable as ordinary income to you under the provisions of section 22(a) of the Internal Revenue Code of 1939.

Similarly, in its return for the year ended July 31, 1951, Pioneer Plaza #2, Inc., reported under the Gross Income caption "gross receipts $1,000,988.64" less "cost of operations $1,004,092.02" and an operating loss of $3,103.38. As in the case of Pioneer Plaza, Inc., the costs of operations were itemized in the return but the source of the gross receipts was not specified. In the Teri-Plaza, Inc., return for its year ended September 30, 1951, "gross receipts" of $1,713,174.79 and itemized "cost of operations" of $1,720,191.69 were shown under the Gross Income caption with a resulting operating loss of $7,016.90.

The respondent's deficiency notices to petitioners here with respect to these two transferor corporations also specify that the profits from the operations should be increased because gross receipts were understated in the respective amount of $109,761.36 and $235,325.21. Respondent increased the operating costs for both Pioneer #2 and Teri-Plaza and finally came up with "Revised gross income" which he added to "net income reported" in his notices. Respondent's explanations for his adjustments were similar to those set forth above in the case of Pioneer Plaza, Inc., and the resulting deficiencies in each case were computed on the basis of corporate "Net income as revised" after interest income reported by the corporations on the notes from stockholders was eliminated as detailed in our findings.

In his brief, respondent sets up the following schedule to show the gross income reported by the transferor corporations as adjusted in the transferee notices:

|  | Gross income | | |
|---|---|---|---|
|  | Per return | Adjustment | As revised |
| Pioneer Plaza, Inc. | $4,688.25 | $325,103.49 | $329,791.74 |
| Pioneer Plaza #2, Inc. | 2,082.39 | 73,198.57 | 75,280.96 |
| Teri-Plaza, Inc. | 6,499.31 | 150,145.50 | 156,644.81 |

However, it is by no means certain that the figures in the first column above represent "gross income" in the section 275(c) sense. Pioneer Plaza, Inc.'s return shows:

| | |
|---|---:|
| Gross sales | $2,119,785.01 |
| Cost of operations | 2,125,961.09 |
| Loss | 6,176.08 |
| Total income and net income | 4,688.25 |

Respondent himself recognizes this in his reply brief where he states that "the net profits were omitted." In the case of the other two corporations also, total income and net income reported were the same as detailed in the table set forth in our Findings of Fact.

Nowhere in the corporate income tax returns here involved is there an item labeled as "gross income." In certain cases gross income from business is defined as total sales less cost of goods sold but the transferor corporations here were not "manufacturing, merchandising or mining business[es]." See *Edward F. Webber*, 21 T.C. 742 (1954), affd. 219 F. 2d 834 (C.A 10, 1955); and sec 29.22(a)-5, Regs. 111.

Without going into the various factual niceties and distinctions involved in the many previous cases that have involved such perplexing problems in this area, we conclude and hold that the gross sales figure shown in the corporate returns here involved was the "gross income reported" within the purview of section 275(c). It was so treated by respondent in his notices to the transferees of Pioneer Plaza, Inc., as shown by the following schedule contained in the notice to Louis Lesser, docket No. 63409:

| | |
|---|---:|
| Total sales as corrected | $2,486,450.00 |
| Cost of goods sold as corrected | 2,161,445.79 |
| Revised gross profit | 325,004.21 |
| Loss reported per return | (6,176.08) |
| Increase in gross profit | 331,180.29 |

Similar treatment was given in the other cases also. In each case respondent's adjustments to gross receipts from the sale of houses falls far short of disclosing an omission from the return of such receipts in excess of 25 percent of those reported. The following table illustrates this:

| Corporate taxpayer | Gross receipts reported | 25 percent of reported receipts | Respondent's adjustment |
|---|---:|---:|---:|
| Pioneer Plaza, Inc | $2,119,785.01 | $529,946.25 | $366,664.99 |
| Pioneer Plaza #2, Inc | 1,000,988.64 | 250,247.16 | 109,761.36 |
| Teri-Plaza, Inc | 1,713,174.79 | 428,293.69 | 235,325.21 |

Section 275(c) is not so much concerned with the technical distinction of the terms "gross sales" and "gross income." It is the omission of items of income from the return to which the statute is directed. As was pointed out by the taxpayer in the *Colony, Inc.* case, "the statute is limited to situations in which specific receipts or accruals of income are *left out* of the computation of gross income." With this contention the Supreme Court specifically agreed. The Court then went on to hold that section 275(c) was enacted only to give the Commissioner an additional 2 years to investigate tax returns in cases where a taxpayer omitted to report some taxable items because in such cases the return on its face provides no clue to the existence of the omitted item. *The Colony, Inc.* v. *Commissioner, supra* at 33, 36.

Certainly, respondent cannot claim here that he was under any disadvantage because the returns on their face provided no clue to the existence of the alleged omitted income. Actually, there was no omission of any item of specific receipts of income but rather an understatement of total sales amounting to the difference between the amount of the reported gross sales of the houses to the stockholders and the amount of their sale to the public which respondent by his determinations has held was taxable to the corporations. Section 275(c), we think, is not applicable to extend the statute of limitations here because there was not an omission from gross income in excess of 25 percent of the amount reported by the corporate returns filed.

At the trial of these cases respondent moved to amend his answers in docket Nos. 63409 through 63413, to plead an extension of the period for assessment of any taxes due from Pioneer Plaza, Inc., for the taxable years ended August 31, 1950, to June 30, 1955, inclusive, by a waiver (Form 872) signed by Donald Metz as vice president of Pioneer Plaza, Inc., on November 4, 1953. The waiver is attached to the company's 1950 return in evidence as respondent's Exhibit A. Respondent's motion to amend the pleadings was taken under advisement by the Court.

Petitioners contend that respondent's motion to amend was untimely and should, therefore, be denied. They further contend that the waiver is invalid because at the time of its execution Donald Metz had no authority to act for Pioneer Plaza, Inc.

After careful consideration of the question, we have concluded that respondent's long-delayed motion to amend his answers to plead the extension of the statute of limitations by the waiver, should be granted, and it is so ordered.

Respondent's delay in pleading the extension of the statute by waiver apparently was due to his reliance on section 275(c). In any event petitioners have suffered no injury by the delay. At trial they

were given the opportunity to submit any evidence they might want to offer in support of their challenge of the waiver.

The parties are in agreement that the validity of the waiver must be determined under the laws of the State of California where it was executed. See *United States* v. *Krueger*, 121 F. 2d 842 (C.A. 3, 1941). Under the laws of the State of California,[4] the directors of a dissolved corporation become the trustees of the corporation with power to transact any unsettled business. See *McPherson* v. *Commissioner*, 54 F. 2d 751 (C.A. 9, 1932) ; *Carpenter* v. *Bradford*, 23 Cal. App. 569, 138 Pac. 946 (1913). However, the record fails to disclose who those directors were with respect to the dissolved corporations here involved.

The burden of proof to establish that Metz was a director of Pioneer Plaza, Inc., at the time of its dissolution was clearly on respondent. The evidence is far from convincing that he was a director of the company at that time. While the preliminary agreement of July 29, 1949, between the investor and the management groups, set out in part above, provided that Metz was to serve as one of the four directors of the company, that is totally inadequate to establish that he was a director upon dissolution or had any subsequent authority to bind Pioneer Plaza, Inc., when he purportedly signed the waiver in 1953.

While the evidence discloses that Metz was vice president of the company and signed the returns of all of the transferor corporations as vice president and while he acted generally as the business manager of all three of the transferor corporations, the respondent has failed to meet his burden that a valid or binding waiver was executed by someone having power and authority to act for Pioneer Plaza, Inc., at the time.

In the *McPherson* case, the Ninth Circuit Court of Appeals held that a waiver executed by the trustees of a dissolved corporation acting under section 400 of the Civil Code of California, was a valid waiver. We might be able to reach the same conclusion here if the evidence justified it, but it falls far short. We do not know who the directors of Pioneer were upon its dissolution or who would have authority to bind it by executing a waiver in 1953.

We think that the waiver here is patently invalid and that the untimely notices of transferee liability which respondent sent to petitioners as transferees of Pioneer Plaza, Inc., cannot be upheld be-

---

[4] Cal. Corp. Code sec. 4602. Expiration of term. Except as otherwise provided by law, if the term of existence for which any corporation was organized expires without renewal or extension thereof or if the corporation is otherwise dissolved, the directors shall terminate its business and wind up its affairs. * * *

Cal. Corp. Code sec. 5205. Cessation of corporate existence ; discharge of directors. Upon the making of the order declaring the corporation dissolved, corporate existence shall cease except for the purposes of further winding up if needed, and the directors or trustees shall be discharged from their duties and liabilities, except in respect to completion of the winding up. * * *

cause of respondent's belated reliance on the Metz waiver of Pioneer's rights.

We, therefore, hold that petitioners are not liable as transferees of Pioneer Plaza, Inc., as transferees of Pioneer Plaza #2, Inc., or as transferees of Teri-Plaza, Inc., for any of the deficiencies determined against those corporations. All deficiency notices here involved were barred by lapse of time.

*Decisions will be entered for the petitioners.*