BERNARD MILLER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent. Miller v. Commissioner
Docket Nos. 6628-72, 6629-72, 761-73.
United States Tax Court
T.C. Memo 1975-356; 1975 Tax Ct. Memo LEXIS 16; 34 T.C.M. (CCH) 1541; T.C.M. (RIA) 750356; December 18, 1975, Filed Justin L. Goldner and Charles B. Baumer, for the petitioners. Alan R. Herson, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined deficiencies in Duro Engineering and Mfg. Co.'s Federal corporation income tax for the taxable years ended October 31, 1967 and August 23, 1968 of $31,250.38 and $1,565.62, respectively. The corporation has since dissolved. On a theory of transferee liability, respondent asserts that petitioner Bernard Miller [2] is financially responsible for these deficiencies in their entirety and that Stuart Arkin is financially responsible for these deficiencies *18 to the extent of $12,375. Concessions having been made, the issues remaining for decision are: 1. Whether the following deductions claimed by Duro Engineering and Mfg. Co. for its taxable year ended October 31, 1967 are allowable: (a) a sales commission expense in the amount of $45,000; (b) a bad debt in the amount of $5,019.32; (c) $374 paid to the Schneck Hotels; (d) $630 paid to the Gardena Travel Agency; (e) $1,659.19 paid to World Wide Tours; (f) $1,000 paid to Eric Rosenall; and (g) $1,879 paid to the State of California as franchise taxes; 2. Whether Stuart Arkin is a transferee of Duro Engineering and Mfg. Co. within the meaning of section 6901[3] of the 1954 Code; 3. The fair market value of the shares of Republic Corporation on the date received by Stuart Arkin and Bernard Miller; and 4. Whether consents to extend the statute of limitations with respect to Duro Engineering and Mfg. Co.'s taxable years ended October 31, 1967 and August 23, 1968 were validly executed. [4]
*19 FINDINGS OF FACT Prior to its dissolution in 1968, Duro Engineering and Mfg. Co. ("Duro") was a California corporation with its principal office in Los Angeles County, California. Its officers were Bernard Miller ("Miller"), president, and Sherwin Mintzer ("Mintzer"), secretary-treasurer. Its directors were Miller, Mintzer and Stuart N. Arkin ("Arkin"), the attorney who had originally incorporated Duro in the early 1960's. Duro timely filed its Federal corporate income tax returns for its taxable years ending October 31, 1967 and August 23, 1968 with the district director in Los Angeles, California. [5] Duro kept its books and records on the accrual method of accounting. Petitioner Miller, as a former officer of Duro, signed Duro's petition in August 1972, and subsequently filed it with the Court. Miller's residence was Portuguese Bend, California, when he filed his petition. Arkin's residence on the date he filed his petition was Los Angeles, California. On October 5, 1966, the *20 Miller/Mintzer Corporation ["M & M"] was incorporated under the laws of the State of California. Its purpose was to act as the exclusive sales agent for Duro, and it was formed primarily to obtain and retain the services of Anthony Bello ("Bello"). Bello had formerly worked as a salesman for another company which manufactured products similar to those produced by Duro. He enjoyed an excellent rapport with certain customers, particularly customers in the East. Miller and Mintzer believed he would be able to open markets to Duro not otherwise available. In exchange for his services Bello evidently wanted a proprietary interest in the business rather than a salary as an employee. Miller and Mintzer found this acceptable, but rather than directly transferring shares of Duro to Bello, they decided to incorporate M & M and divide its shares equally among Miller, Mintzer and Bello. For over a year from the date of incorporation, however, only Miller and Mintzer were shareholders of record in M & M. Bello was made a one-third shareholder of record at a meeting held on November 30, 1967. Before that date he had no contractual right to any shares of M & M, or at the least, the record is *21 insufficient to support a finding that he did. At the same meeting Bello was designated the general manager of M & M. Duro and M & M had a contract which required M & M to bear all of the expenses of selling Duro's products. On August 6, 1968, Duro entered into an agreement with Republic Corporation ("Republic") wherein Duro agreed to transfer all of its assets to Republic in exchange for 15,000 shares of Republic common stock. The actual transfer of assets occurred on August 23, 1968. After this transfer both Miller and Mintzer became employees of Republic. In the Plan of Reorganization and Agreement of August 6, 1968, Republic and Duro agreed that if the fair market value on November 30, 1970 of Republic shares Duro received would be, less than $1,125,000, if unrestricted, then Republic would issue to Duro or its Liquidating Agent up to 3,000 additional shares so that the fair market value of the consideration as of November 30, 1970 would be the value of the originally transferred shares plus 3,000 more, or shares with a value of $1,125,000 if unrestricted, whichever was lower. Arkin represented Duro with respect to Republic's acquisition of Duro's assets. Although he was *22 on a retainer with Duro, the scope of his responsibilities did not include such extraordinary services as negotiating and drafting the agreement with Republic. Initially, Miller, Mintzer and Arkin agreed that Arkin would receive, as compensation for legal services rendered with respect to the acquisition, 3 percent of the shares of Republic stock. They learned, however, in negotiations with Republic prior to executing the agreement on August 6, 1968, that Republic would issue a single certificate for 15,000 shares made out to Duro. They were further informed that the only way that the 15,000 shares could be transferred to individuals would be through a dissolution of Duro and a distribution of the 15,000 Republic shares to the Duro shareholders. Accordingly, in June 1968, Arkin accepted 2.7 percent of the total outstanding stock of Duro. [6] On the date of transfer of Duro assets to Republic, Duro had three shareholders, Miller, Mintzer and Arkin, who held 48.65 percent, 48.65 percent and 2.7 percent of the stock, respectively. On August 10, 1968, a special meeting of Duro's *23 Board of Directors was held. All of the directors attended. The Board approved the sale of assets to Republic, and also approved the liquidation and dissolution of Duro. In addition, the Board authorized the officers of Duro to pay all fees and taxes and do such other acts as they might deem necessary or proper in order to carry out the liquidation and dissolution of Duro. [7]
Duro's corporate income tax return for its final taxable year ended August 23, 1968 was filed on or before November 15, 1968. On October 3, 1968, Duro was legally dissolved in accordance with California law. On the same date, Duro distributed the 15,000 shares of Republic to its three shareholders according to their percentage interest. On that day Republic shares were trading on the New York Stock Exchange *24 for approximately $55 per share. Arkin received 450 shares of Republic, three percent of the 15,000 transferred. He was also entitled to participate in the guarantee of up to 3,000 additional shares should the fair market value of the 15,000 shares as of November 30, 1970 be less than $1,125,000. Arkin would not have accepted the Duro stock as a legal fee but for the fact that he expected his Duro stock to be quickly exchanged for Republic stock. At all times up to and including the time of trial, Arkin considered and treated the Republic stock as property belonging to his law partnership rather than his own property. Arkin and his law partner, Alvin Weissman, had a continuing agreement whereby stock acquired pursuant to services performed for a client was to be held solely in the name of the attorney who performed the services, even though it was the property of both attorneys. Arkin did not report the receipt of either the Duro stock or the Republic stock on his individual income tax return for 1968, nor was it included in the law partnership's return. Miller and Mintzer each received 7,275 shares of Republic. The Republic shares received by Miller, Mintzer and Arkin were subject *25 to the following restrictive legend which would at least initially prevent such stock from being publicly traded: The shares of stock represented by this certificate have not been registered under the Securities Act of 1933. The registered holder hereof has represented to the issuer that they have not been acquired with a view to distribution or resale. Furthermore, no transfer of the stock represented by this certificate shall be valid or effective unless and until the conditions specified in a certain agreement by and between REPUBLIC CORPORATION and DURO ENGINEERING AND MFG. CO., dated August 6, 1968, have been fulfilled. The holder of this certificate, by acceptance of same, agrees to be bound by the provisions of such agreement. Shortly after receipt of the Republic stock, Miller attempted to sell his shares by means of a private placement. Due to the restrictive legend he was offered only ten percent of the trading value based upon a thirty day average. When Arkin received the Republic stock, he had expected to be able to sell it free of the restrictive legend within two years. In August 1969, Arkin attempted to obtain a noaction letter from the staff of the Securities *26 and Exchange Commission which would make it safe to sell his Republic stock, but was unsuccessful. In the fall of 1970, he again attempted to obtain a no-action letter but was again unsuccessful. In the early part of 1970 Mintzer transferred 2,000 shares of Republic stock to two individuals who took subject to investment restrictions. The record does not indicate what, if any, consideration was received for the stock. In 1971, Mintzer again attempted to obtain a noaction letter but was not successful. Petitioners and respondent have agreed that, because of the restrictive legend contained on the Republic shares, the fair market value of said shares as of the date of receipt could be no greater than one-half of their trading value of $55 per share. The value of a share of Republic stock, so restricted, on October 3, 1968 was $27.50. In 1969, months after Duro dissolved, Morris Rogers ("Rogers"), an Internal Revenue Agent, audited Duro's corporate income tax returns for the years ended October 31, 1967 and August 23, 1968. Some of his adjustments for the taxable year ended October 31, 1967 are in dispute herein. At the time of trial both Rogers and Duro's accountant were deceased. *27 Furthermore, since Republic's acquisition of Duro's assets, Republic has accidentally lost Duro's books and records. Republic had evidently taken possession of them at the time of the acquisition. At respondent's request Mintzer made several efforts to find these documents, but could find only a few individually incoherent parts of the books and records. The following deductions were claimed on Duro's Federal income tax return for the tax year ended October 31, 1967: Sales Commission. Duro claimed as a deduction a sales commission expense in the amount of $45,000 payable to its sales agent, the M & M corporation. The record does not indicate whether this amount or any portion thereof was actually paid to M & M. This claimed deduction was disallowed in its entirety. Bad Debt. Duro claimed $5,019.32 as a bad debt deduction for a debt owed by Westcom. Norton Wisdom ("Wisdom") represented to Duro that he would be able to develop for Duro a ceramic gas line filter. In connection with this Duro loaned $5,019.32 to Wisdom and/or his wholly-owned corporation, Westcom, noting the amount on the books as an account receivable. Wisdom never produced a workable model of a ceramic *28 gas line filter. During the summer of 1967, Duro was informed by the police that certain equipment which had been purchased by Duro from Wisdom was in fact stolen property. Accordingly, the police confiscated that equipment. Miller and Mintzer then made several attempts to locate Wisdom, but like the police and a number of Wisdom's ex-wives, they were unable to do so. Duro considered suing Wisdom for return of the advanced amounts, but, after much deliberation, concluded that a law suit would be futile and wasteful. Duro then deducted the entire amount advanced to Wisdom as a worthless debt. The debt became worthless during Duro's taxable year ended October 31, 1967. Schneck Hotel and Gardena Travel Agency. Duro claimed a deduction for $374 paid to the Schneck Hotel of New York and $630 paid to the Gardena Travel Agency. These expenses were incurred by Miller on Duro's behalf while on a trip to the New York City area to visit several of Duro's customers. Upon returning to Los Angeles, Miller prepared a detailed report which included the expenses he had incurred and the parties contacted on the trip. This report was given to Mintzer, who in turn gave it to Duro's bookkeeper to *29 be filed as a part of Duro's books and records. As was the case with all of Duro's books and records, this report was not available at trial. World Wide Tours. Duro claimed a deduction for $1,659.19 paid to World Wide Tours. These expenses were incurred on a trip taken by Mintzer to Israel and Italy. The trip was part business and part pleasure. Mintzer purchased three punch presses while in Israel and two lathes while in Italy. He also engaged in certain personal activities, such as sightseeing, while on this trip. Upon returning from Europe Mintzer likewise made a detailed report of expenses of his trip and persons contacted. This report was made a part of Duro's books and records, and, like the rest of Duro's books and records, was unavailable at trial. Automobile Purchase. Duro deducted $1,000 as a business expense for a Pierce Arrow automobile purchased from Eric Rosenall ("Rosenall"). This automobile was purchased for the purpose of selling parts to Duro's customers and reproducing some of the other parts. California State Tax. Duro claimed a $1,879 deduction for franchise taxes paid to the California Franchise Tax Board. No refund of the tax was received. *30 Respondent disallowed $470 of this deduction in his notice of deficiency. In January 1971, Mintzer, Miller and Arkin signed a document titled "Consent Fixing Period of Limitations Upon Assessment of Income and Profits Tax" (Form 872) ("consent"). The document purported to extend the period within which a deficiency could be assessed against Duro for its tax year ended October 31, 1967, to November 30, 1971. The three individuals signed the form in the signature block labeled "corporate (officers) sign here." Next to his signature Mintzer wrote his former title of "sec & tres". In addition, the face of the form below the signature block contains the following typewritten language: "The last subsisting directors acting under authority of section 4800 and/or 4801 of the California Corporation Code." That typed language was on the document at the time the signatures were affixed. The action of the revenue agent in securing the signatures did not reach the level of fraud or duress. No material alteration occurred subsequent to the signings. Miller and Mintzer signed the consent as former officers of Duro. On August 16, 1971, Miller and Mintzer signed a second consent agreement purporting *31 to extend the period in which any deficiency could be assessed against Duro for the taxable years ended October 31, 1967 and August 23, 1968 until June 30, 1972. Miller's signature appeared in both the signature block of "taxpayer" and in the signature block of "corporate (officers)." Mintzer's signature appeared only in the signature block for "corporate (officers)." This consent also had the same typed language below the corporate officers' signature block, which was present when the consent was signed. No material alteration occurred subsequent to the signings, nor did those who signed affix their signature as a result of coercion or fraud by the revenue agent. Miller and Mintzer signed the August 16, 1971 consent as former officers of Duro. Miller, Mintzer and Arkin did not call a meeting before signing any of the consents. Indeed, they did not even informally discuss the matter among themselves immediately prior to signing any of the consents. The respondent subsequently mailed a Statutory Notice of Deficiency dated May 22, 1972 to Duro in care of Mintzer. On May 22, 1972, respondent mailed a statutory notice to Miller, in which respondent determined that Miller was liable *32 for the full amount of deficiencies assessed against Duro, plus interest as provided by law. On December 11, 1972, respondent mailed a statutory notice to Arkin, in which respondent determined that Arkin was liable for $12,375, the sum which respondent alleged to be the fair market value of the Republic stock which Arkin had received as a result of the Duro-Republic reorganization. OPINION 1. Deductions Claimed by Duro.
On its Federal income tax return for the year ended October 31, 1967, Duro claimed certain deductions which respondent disallowed, either in whole or in part. At the time of trial, the revenue agent who had examined Duro's books and records was deceased. The corporation's accountant was also deceased. Moreover, the books and records of Duro were not available. Thus, in many instances we have nothing more than our judgment concerning the credibility of the witnesses with which to decide these issues. Sales Commission. Duro, an accrual basis taxpayer, claimed as a deduction a sales commission of $45,000 for services rendered by M & M, its exclusive sales agent. Respondent argues that the sales commission agreement between Duro and M & M was consummated *33 by related parties not dealing at arm's length, and the resulting book entries merely reflect the form and not the substance of the transaction. Petitioners first argue that Duro and M & M were not related parties because M & M was established to give salesman Anthony Bello a piece of the business, and even though no stock was in fact issued to him in the year in issue, he had an equitable interest in one-third of M & M's stock. The record simply is insufficient to support petitioners' contentions. On the contrary, on the record Miller and Mintzer appear to be both the sole legal and equitable owners of M & M during the year in issue. While they testified that Bello had equitable rights, they did not produce Bello nor did they put in evidence the original sales contract with Duro. Their testimony was not convincing. Moreover, there is no adequate proof that the terms of the exclusive sales agreement were carried out or that there was any substance in fact to this arrangement between Duro and M & M. Petitioners have failed to prove that M & M actually earned the sales commission, bore its burden of sales expenses, and functioned as an independent entity dealing at arm's length with *34 Duro. Nor is there any proof that the $45,000 was ever paid rather than being simply entered on the books and records and tax returns of these related parties with no intention of ever paying the sum. While it is true that an accrual basis taxpayer need not have paid its expenses to be entitled to deduct them, it cannot deduct an expense it never intended to pay. We sustain respondent on this issue. Bad Debt. Duro deducted $5,019.32 as a bad debt payable by Westcom which had become worthless during its taxable year ended October 31, 1967. Respondent asserted in its statutory notice that Duro failed to establish that the debt became worthless during that year. Duro advanced the $5,019.32 to Norton Wisdom (through his wholly-owned corporation, Westcom) to enable him to research and develop a workable model of a ceramic gas line filter. Wisdom thereafter disappeared. During the summer of 1967 Miller and Mintzer couldn't find him, the police (who wanted to talk to him about stolen property) couldn't find him, and his ex-wives seeking their support payments couldn't find him. There seemed *35 no way to collect the debt, and therefore Duro wrote it off. Under the facts, we have found the debt became worthless during Duro's taxable year ended October 31, 1967. Travel Expenses. Duro claimed a $375 deduction for payment to the Schneck Hotel and a $630 deduction for payment to the Gardena Travel Agency. These expenses were incurred by Miller on a trip to New York on Duro's behalf. Duro also claimed a $1,659.19 deduction for payment to World Wide Tours for expenses of Mintzer's trip to Israel and Italy. Respondent disallowed these deductions on the grounds that petitioners have failed to substantiate those claimed deductions as required by section 274. Miller prepared adequate records of expenses of his trip to New York and Mintzer prepared adequate records of his trip to Israel and Italy as required by section 274 (d), and the records were made a part of Duro's books and records. However, Duro's books and records were lost or misplaced by Republic and were not available at time of trial. Under section 1.274-5(c)(5), Income Tax Regs., if a taxpayer can *36 establish that it once possessed adequate records and that the present lack of those records is due to fire, flood, or other casualty beyond its control, then the taxpayer is free of the normal substantiation requirements. The taxpayer instead must reasonably reconstruct its expenditures. The facts here do not support petitioners' claim that the records were lost due to casualty beyond the taxpayer's control. The mere loss or misplacement of records does not sufficently resemble flood or fire to be considered a casualty. Joe F. Gizzi, 65 T.C. - (November 4, 1975). Petitioners here have failed to meet the substantiation requirements of section 274 with respect to Miller's New York trip and Mintzer's trip to Israel and Italy. Since Mintzer's trip to Israel and Italy fails to meet the sub-stantiation requirements for the same reasons as Miller's trip to New York, we need not reach the question whether this foreign travel must be allocated under section 274(c)(1) or whether it falls within the exception to that requirement contained in section 274(c)(2)(B) because less than 25 percent of the foreign travel time was attributable to nonbusiness purposes. Purchase of Automobile. *37 Duro purchased a Pierce Arrow automobile from a Mr. Rosenall for $1,000 with the intent of selling parts from the automobile to its customers in its ordinary course of business. Respondent disallowed deduction of the $1,000 payment because it "could not be substantiated from your records." However, since the car was purchased to obtain parts for Duro's inventory, the cost of the automobile is not a deductible business expense, whether or not substantiated. Rather, it becomes part of cost of goods sold. Section 1.471-1, Income Tax Regs. Another reason given for purchasing the car was to reproduce some of its parts. If any part were used as a prototype, it is deductible only if petitioners show its useful life is less than one year. Section 1.461-1(a)(2), Income Tax Regs. No such evidence was introduced. California State Franchise Tax. Duro deducted California State Franchise Tax in the amount of $1,879. Respondent disallowed.470 of this amount. *38 There is no explanation by respondent why this sum was disallowed. Mintzer testified that Duro paid its California tax in full, the amount shown on the return was $1,879, and Duro received no refund of any part of that amount. On this scant, but credible testimony, we hold for petitioners. 2. Arkin's Liability As A Transferee.
We next turn to the question of whether Arkin is liable as a transferee within the meaning of section 6901. Despite the fact that he never wanted to own Duro stock and that he became a Duro stockholder only as a means by which to acquire Republic stock, we conclude that Arkin is liable under section 6901. On August 6, 1968 Duro agreed to transfer all of its assets to Republic in exchange for 15,000 shares of Republic common stock. In order to compensate Arkin for acting as attorney for Duro in this matter, it was agreed that Arkin would receive 3 percent of the Republic stock. When it became known that the Republic shares would be issued in a block to Duro, it was decided that Arkin would receive 2.7 percent of the total outstanding Duro stock as compensation for his services, and when the Duro stock would be subsequently exchanged for Republic stock, *39 he would receive 3 percent of the Republic stock which amounted to 450 shares. Accordingly, Arkin received the Duro stock in June 1968 and then, soon after the Duro dissolution, which occurred on October 3, 1968, he received the Republic stock in exchange for his Duro stock. Arkin would not have accepted the Duro stock as a fee but for the fact that he expected the Duro stock to be exchanged shortly for Republic stock. Although Arkin received his Duro stock as compensation for services, at the time of the liquidation of Duro he was in no better position than the other Duro shareholders. Like them, he received his Republic shares in exchange for his Duro shares. He did not receive his Republic shares as compensation for services performed; he had already been paid in Duro shares. The distribution in complete liquidation of Duro rendered it unable to pay its tax liabilities here in issue. Arkin, as a shareholder of Duro, is a transferee of Duro. Section 301.6901-1(b), Proced. & Admin. Regs. As such he is liable for Duro's tax obligations to the extent of the value of the assets received in *40 liquidation of Duro, i.e., 450 shares of Republic. 3. Fair Market Value of Republic Stock.
In order to determine the extent to which transferee liability exists under section 6901, we must next determine the fair market value of the lettered Republic stock received by the Duro shareholders upon dissolution. Beyond stipulating that due to its restrictions the value of the stock at the time of receipt was no more than $27.50 per share, one-half of its then trading value on the New York Stock Exchange, the parties have done little to aid us in determining its exact value. Rather than introducing any expert testimony, petitioners merely testified in vague generalities concerning the parties' unsuccessful efforts to remove the legend and sell the stock. From this we are asked to conclude that the stock had no value at all. This we decline to do. We have found as a fact that the restricted Republic shares which the individual petitioners received from Duro were worth, at the time of receipt, $27.50 per share. Although subsequent events may give some insight, it is the value of the Republic stock on the date of receipt by the shareholders that is controlling. Bartmer Automatic Self Service Laundry, Inc.,35 T.C. 317, 326 (1960). *41 At the time of receipt Arkin, who had every reason to accurately assess the situation, believed that the restrictions would be removed in a relatively short period of time. Furthermore, in the Plan of Reorganization and Agreement it was agreed that if the unrestricted fair market value of the Republic shares received by Duro was less than $1,125,000 on November 30, 1970--over two years after the sale of assets--then Republic would issue additional stock to Duro, or Duro's successors in interest. Specifically, Duro would receive up to 3,000 shares of Republic to bring the fair market value of the stock (if unrestricted) to $1,125,000. Because this additional consideration was limited to not more than 3,000 shares, it was possible for the total consideration to be worth less than $1,125,000 on November 30, 1970. Still, this guarantee had obvious value and for two reasons must be taken into account when valuing the legended stock. First, the value of each share of stock must reflect its aliquot share of the value of the guarantee, whatever that may be. Secondly, the fact that this guarantee was given reflects a confidence on the part of Republic, a party with obvious knowledge and interest *42 in the matter. All things considered, we do not believe that the evidence presented allows us to affix a value below $27.50 per share. 4. Validity of Cosents.
Finally we turn to the issue of whether the consents to extend the statute of limitations on Duro's corporate income tax liability were valid. The issue of their validity has a direct effect only on Arkin's transferee liability. [7]
Petitioner Arkin contends that the consents were invalid and therefore ineffective to extend the statute of limitations for the following reasons: (1) that if petitioners' signatures on the consents are considered to be those of former officers, any delegated authority on behalf of the corporation did not include signing those waivers; (2) that only a majority of Duro's former board *43 of directors, acting as a board, had the necessary authority to extend the statute of limitations, and that the board never met, formally or informally, to determine whether to sign the waivers; (3) that the consents were materially altered because the typed wording indicating that those signing signed as the last subsisting board of directors of Duro was added after they signed the documents; and (4) that they signed under duress, for the revenue agent who secured their signatures threatened them with jeopardy assessments against their personal property if they refused to sign. If the two consents to extend the statute of limitations are valid, Arkin received a timely statutory notice of transferee liability. His statutory notice was mailed December 11, 1972, which is within one year from June 30, 1972, [8] the expiration date to which the second consent allegedly extended Duro's statute of limitations. We conclude that the two consents were valid for the reasons stated below. The parties agree that the validity of a waiver extending the statute of limitations *44 is determined according to state law where the agreement was executed. UnitedStates v. Krueger,121 F. 2d 842 (3rd Cir. 1941), cert. denied 314 U.S. 677 (1941); see Louis Lesser,47 T.C. 564, 591 (1967). The consents at issue were executed in the State of California. California law provides that "a corporation which is dissolved * * * nevertheless continues to exist for the purpose of winding up its affairs, prosecuting and defending actions by or against it, and enabling it to collect and discharge obligations * * * and collect and divide its assets, but not for the purpose of continuing business except so far as necessary for the winding up thereof." Cal. Corp. Code, sec. 5400 (West 1955). The board of directors of a dissolved corporation continues to manage its affairs. Cal. Corp. Code, secs. 4800 and 5205 (West 1955). See 1 Ballantine & Sterling, California Corporation Laws, sec. 369 (4th ed.). In order to be able effectively to complete its business, the board may delegate responsibility to others. Cal. Corp. Code, sec. 4801 (West *45 1955); 1 Ballantine & Sterling, supra.
On August 10, 1968, Duro's board of directors officially approved the liquidation and dissolution of Duro. In addition the board specifically resolved that the proper officers of the corporation be and they hereby are authorized to pay all such fees and taxes and to do or cause to be done such further acts and things as they may deem necessary or proper in order to carry out the liquidation and dissolution of the corporation and fully to effectuate the purposes of the foregoing resolutions. Duro was dissolved on October 3, 1968. Pursuant to the above directive the board authorized "proper officers" of the corporation to handle all tax-related matters for the corporation. Duro's only officers at the time the resolution was passed were Miller and Mintzer. Pursuant to that authority, on August 14, 1972, Miller, as a former officer of Duro, filed a petition on Duro's behalf with the Tax Court. The record is devoid of any suggestion that anyone questioned Miller's authority as a former officer to act on Duro's behalf in this tax matter. Both Miller and Mintzer earlier signed the consents purporting to extend the expiration of Duro's statute *46 of limitations through June 30, 1972 as officers of the dissolved corporation. Both Miller and Mintzer signed each form in the preprinted signature block labeled "corporate (officers) sign here." Mintzer testified that he signed at least the first consent as a former Duro officer, and he even noted his former position as secretary and treasurer next to his signature when he signed that consent. We have made the factual determination that the typed phrase "The last subsisting directors acting under authority of section 4800 and/or 4801 of the California Corporation Code", appearing below the corporate-officer-signature-block on each consent, was on each consent when signed. The revenue agent evidently included the typed phrases on the consents before they were signed, having reasoned that directors' signatures were needed to validate the consents. [9] He was able to secure Arkin's signature on the first consent. [10] When Miller and Mintzer signed the consents, they disregarded the typed wording, since they did not view their actions as those of Duro's directors. Instead the record reflects that, irrespective of the typed wording on the consents, they viewed themselves signing as Duro's *47 former officers. Further, Miller's subsequent action of signing and filing Duro's petition with this Court in his capacity as a former Duro officer, reinforces our conclusion that the handling of Duro's tax matters after dissolution was delegated to Miller and Mintzer as former officers and that they were fulfilling part of this responsibility when they signed the consents. Therefore we conclude that Miller and Mintzer signed the consents as officers of Duro who were authorized to take such action on behalf of Duro. See United States v. Krueger,supra at 844; McPherson v. Commissioner,54 F. 2d 751, 753 (9th Cir. 1932), affg. 22 B.T.A. 390 (1931); affg. 18 B.T.A. 372 (1929) and 17 B.T.A. 675 (1929), cert. denied 283 U.S. 853 (1931). Petitioners *48 also argue that they signed the consents under duress, alleging that the revenue agent was threatening them with jeopardy assessments against their personal property if they failed to sign. Our view of the record does not support that claim. It was to Duro's advantage to secure waivers in order to allow additional time to locate lost records which would substantiate claimed deductions. Roger's audit was completed in 1969. Respondent did not need additional time to complete the investigation to enable him to issue the necessary statutory notices. When Miller and Mintzer signed the first consent extending the statute of limitations on Duro's tax year ended October 31, 1967 to November 30, 1971, six months remained on Duro's unextended statute of limitations and a year and a half remained to mail a statutory notice against Duro's transferees. When the second consent was signed, while no time remained on Duro's unextended statute of limitations for its tax year ended August 23, 1968, at least a year remained on the transferee statute of limitations. [11]
*49 Since the consents were not executed under duress, and since Miller and Mintzer properly signed them as former officers of Duro, they were valid to extend the statute of limitations through June 30, 1972. Therefore Arkin's statutory notice was timely mailed. In order to reflect our conclusions, Decision will be entered under Rule 155.
Footnotes
1. The following cases are consolidated herewith: Duro Engineering and Mfg. Co., docket no. 6629-72; and Stuart N. Arkin, docket no. 761-73.↩
2. Petitioner Bernard Miller has conceded that he is a transferee of Duro Engineering and Mfg. Co. for purposes of section 6901 of the 1954 Internal Revenue Code↩. 3. All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue. ↩
4. Petitioner Bernard Miller has conceded that since a statutory notice of liability was mailed to him within one year after the unextended statute of limitations expired with respect to Duro Engineering and Mfg. Co.'s Federal income tax returns filed for its taxable years ended October 31, 1967 and August 23, 1968, the issue of the validity and effectiveness of the consents to waive the statute of limitations does not apply with respect to him.↩
5. Pursuant to formal request for an extension of time to file, granted to Duro by the respondent, Duro timely filed its tax return for its taxable year ending October 31, 1967, on July 15, 1968.↩
6. The record does not indicate why Arkin received 2.7 percent rather than 3 percent of Duro's shares.↩
7. That particular provision provides: RESOLVED, That the proper officers of the corporation be and they hereby are authorized and directed to pay all such fees and taxes and to do or cause to be done such further acts and things as they may deem necessary or proper in order to carry out the liquidation and dissolution of the corporation and fully to effectuate the purposes of the foregoing resolutions.↩
7. As noted in our findings, petitioners have conceded that our determination of this issue will have no effect on petitioner Bernard Miller's liability since his statutory notice of liability was mailed within one year after the unextended statute of limitations expired with respect to Duro's corporate income tax returns filed for the tax years ended October 31, 1967 and August 23, 1968. Section 6901(c)↩.
8. See section 6901(c)↩.
9. While the directors' signatures would normally be necessary, as noted above, the directors as a board delegated the responsibility of handling tax matters to Miller and Mintzer. ↩
10. Arkin signed because Miller's and Mintzer's signatures appeared on the consents. He signed the consents without first conferring with the other two individuals.↩
11. When a corporation has dissolved and all of its assets have been distributed, respondent can proceed directly against transferees, rather than first proceeding against the transferor-corporation. Drew v. United States,367 F. 2d 828↩ (Ct. Cl., 1966).